**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

ALEX R. ROBINSON                                                                                               PLAINTIFF

v.                                              No. 4:10CV01417 JLH

MICHAEL J. ASTRUE, Commissioner,
Social Security Administration                                                                      DEFENDANT

**OPINION AND ORDER**

On February 6, 2006, Alex Robinson applied for disability insurance benefits pursuant to Title II of the Social Security Act. He alleged that he has been disabled and unable to work since December 30, 2006 because of "diabetes, painless hematuria, [right] ulnar entrapment, [and] carpal tunnel" syndrome. His application was initially denied on August 1, 2006, and denied upon reconsideration on January 4, 2007. Robinson requested a hearing at which he appeared and testified on February 25, 2008, in Little Rock, Arkansas. A vocational expert also testified at the hearing, and subsequently answered interrogatories submitted by the Administrative Law Judge. In an opinion issued on July 21, 2008, the ALJ concluded that Robinson was not disabled. On July 30, 2008, the Appeals Council denied Robinson's request to review the ALJ's decision.

Subsequently, Robinson commenced this action pursuant to 42 U.S.C. § 405(g) (2006) seeking judicial review of the ALJ's determination. Review by the Court is limited. The Court must determine whether the ALJ's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997); 42 U.S.C. § 405(g). In assessing the substantiality of the evidence, the Court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it; the Court may not, however, reverse the Commissioner's decision merely because substantial evidence would have supported an opposite decision. *Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004) ("Substantial

evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.") (quotation omitted); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

## I. Disability Claim Evaluation Process

The Social Security Administration has promulgated a five-step sequential evaluation process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520 (2011). The first step is to determine whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. The second step is to determine, based solely on the medical evidence, whether the claimant has an impairment or combination of impairments which significantly limits claimant's ability to perform basic work activities, a "severe" impairment. If not, benefits are denied. The third step is to determine, again based solely on the medical evidence, whether the severe impairments meet or equal a listed impairment which is presumed to be disabling. If so, and the duration requirement is met, benefits are awarded. If claimant does not meet or equal a Listing, then a residual functional capacity assessment is made based on all the relevant evidence. The fourth step is to determine whether the claimant has sufficient residual functional capacity, despite the impairments, to perform the physical and mental demands of past relevant work. If so, benefits are denied. The fifth step is to determine whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience. If so, benefits are denied; if not, benefits are awarded. *Id.*

## II. Robinson's Work History

Robinson was born in 1950 and has a high school education. Tr. 19. The ALJ found that

Robinson's only past relevant work was as a mechanic.[1] *Id.* Robinson stated that he worked as a diesel mechanic from 1994 until 2003 and was paid $17.00 per hour. Tr. 55. In this position, he worked on big rigs and would perform such functions as logging the trucks in, tuning the trucks up, changing oil, moving valve bags, overall maintenance, and keeping records. Tr. 439-40. He also stated that he would assign jobs to employees, review work, and log in completion of assigned work. Tr. 55. Robinson testified that he sometimes lifted up to one hundred pounds. Tr. 440. He testified that his work involved a great deal of twisting, bending, and turning. *Id.* Robinson stated that he used machines and tools or equipment. Tr. 55-56. His job required writing as well as technical knowledge or skills. *Id.* Robinson asserted that he supervised fifteen people, and hired and fired other employees. *Id.* He also said that his work involved walking, standing, climbing, stooping, and kneeling about fourteen hours per day. *Id.* It also required him to sit, crouch, crawl, and handle large objects about five hours per day. *Id.* Finally, he was required to write or otherwise handle small objects about eight hours per day. *Id.* Robinson testified that he stopped working as a diesel mechanic in 2003 because his employer moved to another city. Tr. 442.

The vocational expert testified that Robinson's past relevant work was similar to a "tune-up mechanic" which was semi-skilled, heavy work. Tr. 450. The vocational expert testified that a hypothetical individual like Robinson could, for example, perform work as a "telephone solicitor" or "charge account clerk." Tr. 451. However, the vocational expert later stated, in response to the interrogatories from the ALJ, that Robinson's work was similar to an "auto mechanic supervisor" which is skilled, light work or an "auto mechanic" which is skilled, medium work. Tr. 71. He

---

[1] Robinson testified that he also worked for a company that made fiberglass PCP pipes for about two months.

opined that Robinson should be able to work, for example, as a "production clerk" or "inventory clerk." Tr. 72.

### III. Robinson's Medical History

Robinson alleges that he suffers from type 2 diabetes, painless hematuria, right ulnar entrapment, and carpel tunnel syndrome. Tr. 54. Robinson has also alleged that he suffers from hypertension; hearing loss in his right ear; dyspnea and tingling in his chest; and pain in his back, prostate, and kidneys. He has been diagnosed with mild depression. Robinson uses a variety of medications including Finasteride (for prostate), Glipizlde (for diabetes), HCTZ50/Triamterene (for blood pressure), Metoprolof, Omeprazole, Terazosin (for prostate), Valsartan, Viagra, Aloh/MGOH, Colchicine, and Simvastin. Tr. 16-19.

Robinson was diagnosed and treated for diabetes in 2004, but the ALJ found that Robinson has been able to control his diabetes. Further, the ALJ found no evidence of renal impairment, retinopathy, or neuropathy attributed to Robinson's diabetes. In 2005, Robinson was diagnosed with mild to moderately severe hearing loss, but did not meet the audiometric guidelines for hearing aids. The ALJ found that Robinson demonstrated no evidence of hearing loss at the hearing. Pulmonary testing revealed depressed forced vital capacity levels, but these levels later improved. Testing in 2006 showed no significant symptoms related to his dyspnea and chest pain. His baseline EKG and blood pressure results were normal. Robinson underwent an esophagogastroduodenoscopy which disclosed mild chronic inactive gastritis but negative H pylori. Biopsies of his prostate revealed no malignancies. An advanced practice nurse stated that Robinson's right ulnar entrapment and left carpel tunnel syndrome limited his ability to work because it caused him pain and weakness.

Robinson was examined by Dr. Muhammed Shahir on December 12, 2006. Dr. Shahir

diagnosed Robinson with diabetes, left carpel tunnel syndrom, prostatic hermaturia, and hypertension. However, Dr. Shahir found that his weight, blood pressure, and vision were normal. Robinson's range of motion in his cervical and lumbar regions as well as his extremities were normal, but he had a slight decrease in ankle plantar flexion. Robinson's limb functioning, gait, coordination, and grip strength were all normal. Similarly, his ability to hear, see, speak, sit, stand, and walk were normal. However, Dr. Shahir found that Robinson could not use his left hand for fine maneuvers for more than ten minutes.

Robinson was evaluated for depression and given a global assessment of functioning score of 50. However, the examiner found that Robinson's thought process were logical and concluded that his depression did not preclude employment. The examiner noted that his mood was mildly depressed and his insight was somewhat limited. He was later evaluated for depression, but was found not to have a severe mental impairment. Robinson did not complain of depression at the hearing.

Robinson stated that he can stand or walk for about ten to fifteen minutes, and sit for about thirty minutes, before feeling pain. Robinson continues to help clean around his house, do laundry, and a small amount of yard work. Tr. 46. He can drive, go shopping, go to church, pay bills, prepare meals, count change, handle a savings account, and use a checkbook or money orders. Tr. 47. Robinson stated that he can finish activities that he starts, and that he can follow written or oral instructions. Tr. 49.

## IV. The ALJ's Decision

After finding that Robinson met the insured status requirements of the Social Security Act through December 31, 2008, the ALJ followed the five step evaluation process. At the first step, the

ALJ found that Robinson had not engaged in any substantial gainful activity since the alleged onset date. The ALJ found that Robinson suffered from multiple impairments—gastric pain, diabetes, back pain, ulnar entrapment, and hypertension—that restrict his ability to perform basic work activities. The ALJ concluded that these impairments were severe and, consequently, that Robinson had satisfied the second step. The ALJ also found that Robinson suffered from a medically determinable mental impairment of depression. However, the ALJ concluded that Robinson's depression did not create more than minimal limitations and, therefore, was not severe.

Turning to the third step, the ALJ considered listings 1.05 (disorders of the spine), 9.08 (diabetes), 5.06 (granulomatous), 3.02 (chronic pulmonary insufficiency), and 4.03 (hypertensive cardiovascular disease), but concluded that Robinson did not have an impairment or combination of impairments that were medically equivalent to a listing. Consequently, the ALJ found that Robinson had not met the third step. After considering the entire record and applying the guidelines from Social Security Ruling 96-7p and *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), the ALJ found that Robinson's medically determinable impairments could reasonably be expected to produce Robinson's alleged symptoms. However, the ALJ concluded that Robinson's statements regarding the "intensity, persistence and limiting effects of these symptoms" were not credible to the extent they were inconsistent with the ALJ's residual functional capacity assessment. The ALJ concluded that Robinson

> has residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(a) except he experiences mild to moderate pain; stand/walk 2 hours in an 8 hour day; and sit 6 hours in an 8 hour day with a sit/stand option. He is further restricted to occasionally climbing; balancing; stooping; bending; crouching; kneeling; and crawling. Finally, the claimant is further restricted from excessive exposure to chemicals; noise; dust; temperature extremes; vibrations; and other pulmonary irritants.

At the fourth step, based on vocational expert testimony and answers to post hearing interrogatories, the ALJ found that Robinson's employment as a mechanic constituted past relevant work at the heavy, semi-skilled level. The ALJ concluded that Robinson was unable to perform his past relevant work.

Finally, at the fifth step, the ALJ found, based on the evidence and the vocational expert's response to the ALJ's post hearing interrogatories, that jobs which Robinson could perform exist in significant numbers in the national economy. The ALJ stated:

> **10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).**
>
> In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision making (SSR 85-15).
>
> If the claimant had residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Rule 203.17. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the medium occupational base, the undersigned submitted post hearing interrogatories to Mr. Welch whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. Mr. Welch provided written responses dated June 18, 2008 that given all the factors detailed within the hypothetical the individual would be able to perform the requirements of representative occupations

such as a production clerk (DOT 221.380-018) (sedentary, semi-skilled 300,000 national and 60,000 regional positions) and inventory clerk (sedentary, semi-skilled 530,000 national and 165,000 regional positions) (Exhibit B-4F).

Pursuant to SSR 00-4p, the vocational expert's responses are consistent with the information contained in the Dictionary of Occupational Titles.

Based on the evidence provided by Mr. Welch, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

Therefore, the ALJ concluded that Robinson was not disabled and denied his disability claim.

## V. Robinson's Claims of Error

Robinson contends that the ALJ erred as a matter of law and that his decision is not supported by substantial evidence. He contends that the vocational expert's testimony was inconsistent with the Dictionary of Occupational titles and based on a flawed hypothetical question. Robinson also contends that the ALJ failed to factor all of his medically determined impairments into the residual functional capacity determination.

### A.    The Vocational Expert's Testimony

Robinson initially argues that the evidence offered by the vocational expert was unreliable. Robinson contends that the vocational expert's response to the ALJ's interrogatories cannot be relied upon because the hypothetical question presented by the ALJ was flawed in that it did not specify the frequency with which the hypothetical individual would need to alternate between sitting and standing, a deficiency ultimately rooted in the residual functional capacity determination itself. Also, the Dictionary of Occupational Titles descriptions for the positions identified by the vocational expert do not mention a "sit/stand option." Finally, Robinson points to contradictions in the vocational expert's testimony. Consequently, Robinson contends, the ALJ erred in relying on the

vocational expert's testimony, and the ALJ's conclusion at the fifth step is not supported by substantial evidence. *See Jones v. Astrue*, 619 F.3d 963, 978 (8th Cir. 2010) (when vocational expert testimony conflicts with the Dictionary of Occupational Titles, and Dictionary controls if not rebutted).

In *Ellis v. Barnhart*, 392 F.3d 988, 997 (8th Cir. 2005), the Eighth Circuit cited the Social Security Ruling 96–9p, 1996 WL 374185, at *7 (July 2, 1996), stating:

> The need to alternate between sitting and standing more frequently than every two hours could significantly erode the occupational base for a full range of unskilled sedentary work. The Ruling notes that the RFC assessment should include the frequency with which an applicant needs to alternate between sitting and standing, and if the need exists, that vocational expert testimony may be more appropriate than the grids.

(Internal citations omitted). The ruling itself uses mandatory language. Social Security Ruling 96–9p, 1996 WL 374185, at *7. The Tenth Circuit has held that

> the RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing because the extent of the erosion of the occupational base will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand.

*Allen v. Astrue*, No. 09-1271-SAC, 2010 WL 2925169, *6 (D. Kan. July 21, 2010) (citing *Armer v. Apfel*, 216 F.3d 1086 (10th Cir. 2000)); *see also Vail v. Barnhart*, 84 Fed. App'x 1, 2-3 (10th Cir. 2003); *Johnson v. Astrue*, No. 07-1310-MLB, 2009 WL 102681 (D. Kan. Jan. 7, 2009); *Fairbanks v. Astrue*, No. 06-1206-MLB, 2007 WL 2176029 (D. Kan. June 12, 2007).

In the instant case, the ALJ asked the vocational expert at the hearing about the regional and national work prospects of a hypothetical individual who, *inter alia*, "can alternate between sitting and standing as needed." Tr. 450. The vocational expert testified that such a person would not be able to perform Robinson's past relevant work, but that such a person could perform jobs that exist

in the local, regional, or national economy, specifically, sedentary, semi-skilled and unskilled positions. Tr. 451. Following the hearing, the ALJ sent written interrogatories to the vocational expert asking a similar hypothetical question that limited the hypothetical individual to jobs "with a sit/stand option." Tr. 67. In the context, this hypothetical question is reasonably interpreted as meaning that the individual must be allowed to sit or stand as needed. *Cf. Buckner-Larkin v. Astrue*, 2011 WL 4361652, *1 (9th Cir. Sept. 20, 2011) ("a 'sit/stand option' . . . is most reasonably interpreted as sitting or standing 'at will,' based on the record."); *Foster v. Astrue*, 2009 WL 4757239, *2 (M.D. Fla. Dec. 10, 2009) (a commonsense reading of a hypothetical question and residual functional capacity assessment referring to "a sit/stand option" is that it contemplated an option to sit or stand at will); *Younger v. U.S. Com'r of Soc. Sec.*, 2009 WL 2827945, *12 (W.D. La. Sept. 1, 2009) ("it is assumed that the 'sit/stand' option given by the ALJ was implicitly 'as needed' or 'at will.' "). No greater specificity is required. *Thompson v. Astrue*, 2011 WL 3489671, *2 (4th Cir. Aug. 10, 2011) (the residual functional capacity finding and hypothetical "were consistent with an at-will, sit-stand option, and we find that no greater specificity was required here."). The Eleventh Circuit has explained:

> As to Williams's need to change positions at work, the ALJ stated in his hypothetical that "the job would either by his [sic] nature, afford an opportunity to change positions by the way its typically performed, or that it would have what's typically called a sit/stand option as far as being able to perform the work." Although the ALJ failed to specify the frequency that Williams needed to change his sit/stand position, the reasonable implication of the ALJ's description was that the sit/stand option would be at Williams's own volition. This implication satisfies Williams's needs.

*Williams v. Barnhart*, 140 Fed. Appx. 932, 936-37 (11th Cir. 2005). *See also Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (hypothetical included condition that claimant be able to sit or stand at claimant's discretion); *Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir. 2008) (holding that a

10

hypothetical posed by the ALJ to the vocational expert was adequate when it said that the claimant needed "a sit, stand option where he would have to sit or stand as needed during the day."); *Staples v. Astrue*, Co. 08-200-B-W, 2009 WL 232496, *3 (D. Me. Jan. 29, 2009) (hypothetical included condition that claimant be able to sit or stand at will); *Magee v. Astrue*, No. 5:05CV413, 2008 WL 4186336, at *7 (N.D.N.Y. Sept. 9, 2008) (residual functional capacity included condition that claimant be able to sit or stand at will); *Davidson v. Astrue*, 501 F.3d 987 (8th Cir. 2007) (residual functional capacity included condition that claimant be able to sit or stand at will, but claimant did not raise issue); *Conklin v. Barnhart*, 206 Fed. App'x 633 (8th Cir. 2006) (same).

Robinson's next argument is that the vocational expert's testimony is unreliable because the Dictionary of Occupational Titles positions that the vocational expert identified as within the capacity of a hypothetical individual like Robinson do not mention the option to alternate between sitting and standing. Because none of the positions within the Dictionary specifically mention "a sit/stand option," Robinson contends, in effect, that a vocational expert could never rely on the Dictionary when testifying in a case such as this, which is untenable. The Dictionary's "definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." *Page v. Astrue*, 484 F.3d 1040, 1045 (8th Cir. 2007) (internal quotation omitted); *see also Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997) ("The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities.") (internal quotations omitted). The mere fact that the Dictionary does not include a "sit/stand option" in one of its definitions does not create a conflict between it and the evidence offered by the vocational expert or render the vocational expert's responses unreliable.

Robinson also attacks the credibility of the vocational expert by pointing out that the vocational expert testified that Robinson had two years of college at the hearing but later stated that he had four years of college. Similarly, the vocational expert testified that Robinson's past relevant work was as a "tune-up mechanic," but later stated that it was actually that of an "auto mechanic supervisor." The first inconsistency reflects the fact that Robinson testified at the hearing that he had completed two years of college but stated on his application that he had four or more years of college. *See* Tr. 58, 437-38. Regarding the second inconsistency, the vocational expert was attempting to identify work that best reflects the duties which Robinson stated he had performed in his past occupation. Robinson stated on his disability report that he assigned and reviewed jobs, supervised fifteen employees, spent one hundred percent of his time supervising, and hired and fired employees. Tr. 56. However, Robinson did not mention any of this when he testified at the hearing. Tr. 438-43. Hence, it is unsurprising that the vocational expert did not classify Robinson's work as supervisory in nature based on Robinson's testimony at the hearing but then did select a position with a more supervisory role after having an opportunity to look closely at Robinson's application material. *Cf. Stephens v. Sec'y of Health, Educ. and Welfare*, 603 F.2d 36, 41-42 (8th Cir. 1979) (a vocational expert cannot be expected to remember all of a claimant's conditions when answering a hypothetical).

**B.      The ALJ's Residual Functional Capacity Determination**

Robinson also contends that the ALJ erred because he failed to include important limitations in the residual functional capacity determination. Robinson objects to the ALJ's decision not to include limitations that specifically addresses Robinson's right ulner nerve entrapment. *See* Social Security Ruling 96-8p, 1996 WL 374184, at *2, *5 (July 2, 1996) ("In assessing RFC, the

adjudicator must consider limitations and restrictions imposed by all of an individual's [medically determinable] impairments[.]"). Robinson points out that the ALJ determined that this impairment was severe, that is, that it significantly limited Robinson's ability to perform basic work activities. *See* 20 C.F.R. § 404.1520(c) (By definition, "severe impairments" are those "which significantly limit [the claimant's] physical or mental ability to do basic work activities."); *Webber v. Sec'y, Health & Human Servs.*, 784 F.2d 293, 299 (8th Cir. 1986). Robinson cites Paula Shay, a nurse practitioner, who opined that Robinson was disabled due to pain and weakness in his upper extremities. Tr. 74, 176. Robinson also notes that, as the ALJ recognized, the consultive examiner, Dr. Shahir, indicated that Robinson could not use his left hand for fine maneuvers for more than ten minutes. The ALJ assigned Dr. Shahir's opinion considerable weight. Tr. 19.

Shay's conclusion that Robinson was disabled "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." *Ellis*, 392 F.3d at 994. Moreover, Shay is not a "medically accepted source" and, consequently, may at best only "provide insight into the severity of [Robinson's] impairment(s) and how it affects [his] ability to function." *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (citing Social Security Ruling 06-3p, 71 Fed. Reg. 45,593 (Aug. 9, 2006)). The ALJ was entitled to reject Shay's opinion.

Substantial evidence supports the ALJ's conclusion that Robinson's right ulner nerve entrapment did not impose any functional limitations on Robinson above and beyond those already contained in the residual functional capacity. A neurological examination was completely normal and indicated that Robinson's history was not suggestive of any neurological problems. Tr. 115. A physical examination indicated that Robinson's extremities were unimpaired. Tr. 89. At the

consultive exam, Dr. Shahir found no neurological issues. He found that Robinson's limb function—including his ability to hold a pen and write, to touch fingertips to his palm, to oppose his thumb to his fingers, to pick up small objects, and the strength of his grip—was normal. Tr. 143. However, Dr. Shahir did find that Robinson could not use his *left* hand for fine maneuvers for more than ten minutes. Tr. 145. Robinson is right-handed. Tr. 49. Finally, Robinson did not report problems using his hands when he was evaluated on November 1, 2005 and February 23, 2006, or on his social security application. Tr. 41-51, 87, 116. Based on the record as a whole, substantial evidence supports the ALJ's determination that Robinson's right ulner entrapment did not limit his ability to work in any manner not already addressed by the pain limitations and movement limitations contained in the residual functional capacity determination. The ALJ did not err.

## CONCLUSION

For the foregoing reasons, the Commissioner is AFFIRMED.

IT IS SO ORDERED this 8th day of November, 2011.

*/s/ J. Leon Holmes*
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE